## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

RASHEED MCNAIR

CRIM. NO. 3:18-cr-00281 (PGS)

**MEMORANDUM AND ORDER**

This matter is before the Court on Rasheed McNair's Motion for a New Trial (ECF Nos. 97, 98). Extensive briefing accompanies this motion.[1] For the reasons below, McNair's Motion for a New Trial (ECF Nos. 97, 98) is denied.[2]

## I.

On February 18, 2018, Detective Harrison Steimle ("Steimle") and Detective Sergeant Jason Astbury ("Astbury") patrolled a public housing project in Trenton.[3]

---

[1] After briefing, oral argument on the motion for a new trial was held on June 15, 2023. The Court later held a supplemental telephone conference on April 1, 2024. On that same day, Defense Counsel submitted a supplemental brief in support of McNair's motion. (ECF No. 121).

[2] There also is a motion to appoint counsel before the Court. (ECF No. 101). That motion was resolved in a separate application in McNair's civil proceeding in McNair v. U.S.A. (Case No: 3:23-cv-00636). Accordingly, McNair's Motion to Appoint Counsel with relation to his § 2555 petition (ECF No. 101) is denied as moot as it was addressed in the Court's October 11, 2023 opinion.

[3] Transcript references refer to the September 16th and September 17th, 2019 trial transcripts.

1

(1T48:8–1T49:25). This housing project was in a "high-crime area." (1T48:16–18). Steimle testified that, from his passenger seat in the police vehicle, he observed an individual (later identified as Defendant Rasheed McNair ("McNair")) wearing a black face mask while propping the door open with his right foot and holding what Steimle believed was a weapon. (1T50:16–1T51:10). As Steimle's police vehicle approached the area, McNair became aware of the police presence; McNair then tucked the object into his jacket, and he turned and ran into a stairwell. (1T53:24–1T54:8).

Steimle stopped the two individuals who had been in the doorway on the second-floor landing; during this time, McNair continued to run from Steimle. (1T55:8–13). McNair shoved the gun underneath the doormat and proceeded to surrender to Steimle. (1T58:7–13). The doormat did not completely cover the gun; its frame, magazine, and rear side were visible. Astbury retrieved the gun. (1T60:13–24). McNair and the two other individuals were placed under arrest.

No bodycam footage exists of the chase, disposal of the gun, or McNair's surrender because Steimle and Astbury were members of the Street Crimes Unit at the time of McNair's arrest; at that time, the Street Crimes Unit was not issued body cameras per Trenton Police Department policy. (1T164:1–1T165:5). There is some body camera footage, however, as a backup patrol officer who was assigned to a different unit was issued a body camera and arrived on the scene. The backup officer

videoed the lighting and the visibility within the apartment building as well as captured part of McNair's arrest. (1T82:10–1T83:20).

On May 10, 2018, an indictment by a United States Grand Jury charged McNair as a felon in possession of a weapon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1).[4]  Five days later on May 15, 2018, McNair was arrested.   McNair's jury trial began on September 16, 2019.  Steimle testified at trial; Astbury did not. Detective Sergeant Marc Berkeyheiser testified regarding the difficulties of obtaining fingerprint identification from the surface of guns. (1T181–1T90; 2T196–2T208).   Investigator Earl Williams from the New Jersey State Police testified regarding testing and identification procedures done on the gun as the serial number had been filed off. (2T222–2T223).  Special Agent Shoshannah Heskeyahu offered expert testimony as to firearms identification and determining where they were manufactured. (2T256–2T262).  The jury found McNair guilty of the charge of being a felon in possession of a weapon. (ECF No. 76).

In October 18, 2019, McNair sought to have new counsel appointed. (ECF No. 78).  Included in his reasoning was that his trial attorney "fail[ed] to conduct his own investigation on cop's backgrounds." (*Id.*).  The request was granted. (ECF Nos. 82, 83).  Around a year later on October 8, 2020—prior to sentencing—McNair filed a handwritten letter addressed to his appointed attorney and copying the Court.

---

[4] A superseding indictment was later issued on July 25, 2019. (ECF No. 58).

(ECF No. 86).   Within this letter, McNair referred to "a recent article in the *Trentonian*." (*Id.*).  In it, he alleged that the officers who were "'key witnesses'" in his trial had been "criminally charged for planting evidence . . . [in an] unrelated case. " (*Id.*).  As a result, McNair requested that "[his] case [be] dismissed or a new trial without evidence from the rogue officers [be granted.]" (*Id.*). The article was not attached to the letter, nor was it entered onto the docket. (*Id.*).  The Court did not address the letter at sentencing as it was presumed that if the allegations had merit, Counsel would have raised them with the Court.

McNair was sentenced to ten years of imprisonment on December 8, 2020. From a review of the sentencing, the *Trentonian* articles were not mentioned by McNair or his attorney.   McNair appealed, and on appeal to the Third Circuit, McNair argued that the Court erred in denying McNair the opportunity to recross-examine Steimle regarding his lack of body camera. *United States v. McNair*, No. 19-3510, 2021 WL 5492802 (3d Cir. Nov. 23, 2021).   This argument was denied, and McNair's conviction affirmed. (*Id.*).  It does not appear that the *Trentonian* article argument was raised during the appeal.

On July 6, 2022, McNair filed a *pro se* handwritten motion for a new trial based on several *Trentonian* articles.[5]  (ECF No. 97).  On September 8, 2022, the

---

[5] McNair filed a substantively identical *pro se* typewritten motion for a new trial on August 15, 2022.  (ECF No. 98). And while the motions are substantively identical, the Court notes that the articles appended to the two motions—while seeming to

Government filed a response to McNair's motion. (ECF No. 99). On September 22, 2022, McNair moved for additional time to file a reply. (ECF No. 100). On September 23, 2022, McNair filed a motion to appoint counsel. (ECF No. 101). On October 3, 2022, McNair filed a handwritten *pro se* reply brief. (ECF No. 102).

On October 4, 2022, the Court appointed counsel to represent McNair. (ECF Nos. 103, 104). After additional briefing, oral argument was heard on June 15, 2023. The motion papers principally relied upon appended *Trentonian* articles[6] as a basis for relief along with an argument regarding AUSA Gasparian's alleged constructive knowledge of an incident involving Steimle and Astbury planting a gun.[7]

The Court discusses both of these bases below.

**A.** *Trentonian* **Articles**

    1. "Trenton man sues city cops, claims they beat him to pulp after blowing through red light" (dated August 23, 2019) by Isaac Avilucea

---

contain the same material—appear to be appended to the motions in a different order, with pages missing from the typewritten motion's appendices. (ECF No. 98). For this reason, the Court relies upon the articles appended to the handwritten motion. (ECF No. 97).

[6] There are three, complete articles appended to McNair's motion. A portion of another article appears to be appended to the end of the third article at the end of McNair's motion. This appears to be the article "Trenton cops reassigned to patrol after sexist 'firecracker' comment to female federal prosecutor" dated December 4, 2019. *See Trenton cops reassigned to patrol after sexist 'firecracker' comment to female federal prosecutor*, Isaac Avilucea, THE TRENTONIAN (Dec. 4, 2019) https://perma.cc/43GQ-E7B6 (last visited Mar. 15, 2024). Given McNair's *pro se* status at the time of filing, the Court includes this article in its analysis.

[7] *See* discussion at *infra* 7 surrounding Article Three.

This article ("Article One") is noteworthy because it was published shortly before McNair's trial began. The article states that an individual named Genesis Torres filed a lawsuit against Steimle.  The article alleges that Steimle and another Trenton police detective assaulted and battered Torres after a traffic stop in 2017. According to the article, charges were filed against Torres after the arrest.  According to the article, the "serious felony offenses against Torres were dismissed in July 2018.  That article further states that "[r]emaining disorderly persons and motor vehicle offenses were remanded to municipal court . . . ." (ECF No. 97 at 15).

2. "Trenton cops reassigned to patrol after sexist 'firecracker' comment to female federal prosecutor" (dated December 4, 2019) by Isaac Avilucea

This article from the *Trentonian* discusses an inappropriate conversation between Astbury and another Trenton detective regarding a female U.S. attorney. This article details the misconduct of the other police detective involved in this incident; it also discusses misconduct from Astbury's past.  Specifically, it details how alcohol was found in Astbury's patrol vehicle in 2017 "after Astbury was involved in a police shooting that wounded Bahin Lynch[,]" and how Astbury was "stripped of his gun for having a full-blown affair with a fellow officer's wife[]" who sought a "temporary restraining order against Astbury after he 'continued to contact her and demand they continue their relationship[.]'" (*See* ECF No. 97 at 22).

3. "Trenton cops accused of planting gun in newly filed lawsuit" (dated August 3, 2020) by Isaac Avilucea

This article ("Article Three") pertains to the planting of a gun on an individual named Robert Christie on August 11, 2018. It claims that Steimle, Astbury, and another officer were involved in the "fabricat[ion], plant[ing], and tamper[ing] with and with[olding of] evidence that showed [Christie] was innocent of possessing a gun" on that date. (ECF No. 97 at 11). According to the article, the criminal charge was dismissed for insufficient evidence.

> 4. "Trenton man files another brutality suit against Trenton cops over second alleged beatdown" (dated October 6, 2020 (updated on August 19, 2021)) by Isaac Avilucea

This article reports that Torres was assaulted by several Trenton detectives who are uninvolved in McNair's prosecution on November 7, 2018. According to the article, the detectives "unloaded on [Torres] .   . . fracturing three ribs and bruising his face and back." (ECF No. 97 at 18). This article cross-references the 2017 Steimle incident in passing. There are no new facts, and this article appears to be unrelated to McNair's prosecution.

In response to the four *Trentonian* articles, the Government asserts that the records within the federal prosecutor's possession from the Trenton Police Department do not disclose the incidents underlying the *Trentonian* articles and that all the information received from the Trenton Police Department was disclosed to McNair's counsel.

**B. Constructive Knowledge of AUSA Gasparian**

In addition to these articles, McNair asserted an additional basis for relief: former member of the Mercer County Prosecutor's Office (and now-AUSA) Michelle Gasparian's alleged constructive knowledge of another criminal incident involving Steimle and Astbury where they were accused of planting a gun.

With respect to the constructive knowledge of AUSA Gasparian, the Government put for a timeline of facts to disprove the Defense's theory. That timeline is summarized below:

- August 2, 2017: Robert Christie was arrested and charged with homicide and other offenses. (ECF No. 116-1 at 60–69).
- August 16, 2017: Then Assistant County Prosecutor Gasparian signed a Notice of Motion for a Protective Order in Christie's homicide case. (ECF No. 116-1 at 70–72).
- April 2018: Christie pled guilty to a Disorderly Persons offense in the above August 2017 case and was sentenced to time served. The prosecutor at sentencing was not AUSA Gasparian. (ECF No. 116-1 at 55–59).
- August 11, 2018: According to a letter from Assistant County Prosecutor Katie Mae Magee dated February 28, 2019, Robert Christie was arrested and charged with gun possession on August 11, 2018. Steimle was dispatched to the area in question while Detective Astbury was in a car undercover. Stiemle detained Christie. (ECF No. 116-1 at 9–11).
- August 2018: AUSA Gasparian left the Mercer County Prosecutor's Office during this month. She joined the U.S. Attorney's Office shortly thereafter. (ECF No. 116-1 at ¶ 9).
- February 28, 2019: Mercer County Prosecutor's Office opposed Christie's motion to suppress the gun from his August 2018 arrest. (ECF No. 116-1 at 9–16).
- May 23, 2019: Judge Bingham of Mercer County Superior Court signed a Notice of Dismissal in the Robert Christie case for Unlawful Weapon Possession, among other charges. (ECF No. 116-1 at 5).
- September 16, 2019: McNair's trial begins.
- September 18, 2019: The jury renders a verdict of "Guilty" on Count I of the Superseding Indictment in this case.

8

- <u>July 31, 2020</u>: The Civil Complaint in Robert Christie's civil case against Steimle and Astbury was filed. (ECF No. 116-1 at 26).
- <u>August 3, 2020</u>: the *Trentonian* publishes "3 Trenton cops accused of planting gun in newly filed lawsuit."

A review of this timeline reveals several facts. It shows that AUSA Gasparian left the Mercer County Prosecutor's Office in August 2018—the same month that the circumstances surrounding the Christie incident arose. The civil complaint in the *Christie* matter was not filed until nearly two years later—around the same time as Article Three was published. While gun charges against Christie were dismissed in May 2019—four months before trial—there is no clear showing that the reason that they were dismissed stemmed from allegations of misconduct on Steimle's or Astbury's parts.

## II.

As a preliminary matter, the Court harbors serious concerns regarding this motion's reliance on *Trentonian* articles as a basis to overturn a jury verdict. "A newspaper article is, by its nature, a mixture of hearsay and journalistic opinion." *United States v. Lipari*, No. 92-cr-164, 1995 WL 84221, at *7 (D.N.J. Feb. 24, 1995), *aff'd*, 70 F.3d 1258 (3d Cir. 1995). Indeed, no one would suggest that the *Trentonian* contains "all the news" fit to print. More importantly, no one has raised a compelling argument as to how these articles are not hearsay.

There is no evidence corroborating the "facts" of the *Trentonian* articles. McNair's counsel asserts that he is not arguing that the *Trentonian* articles should have been disclosed to the Defense. Rather, he argues that there must have been an internal investigation by the Trenton Police Department into the allegations set forth in *Trentonian* articles. (*See* ECF No. 116 at 10). There is some common sense behind this argument, but the *Trentonian* articles are a one-sided recitation of facts that have not been subjected to an adversarial process or verified by affidavit. So, the conduct put forth in the *Trentonian* article to support a *Brady* motion or a motion for a new trial is subject to dispute. Its basis for admission in trial in the first place is questionable and appears to be hearsay.

This aside, the Court analyzes both bases for relief asserted by McNair—*Brady* and a Rule 33 motion for a new trial—below.

### a. *Brady* Rule

As explained by the Third Circuit Court of Appeals, to prove a *Brady* violation:

> [T]he defendant must show that "(1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material."

*Maynard v. Gov't of Virgin Islands*, 392 F. App'x 105, 112 (3d Cir. 2010) (quoting *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004)). For the purposes of *Brady*, evidence is material "where there is a reasonable probability that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome[.]'" *Maynard*, 392 F. App'x at 112. Where a *Brady* claim is predicated on the argument that suppressed materials would have led to additional exculpatory materials, a "defendant must . . . produce some evidence to show that his investigation would have borne fruit." *Maynard*, 392 F. App'x at 116 (citing *United States v. Agurs*, 427 U.S. 97, 1109–10 (1976)); *see also United States v. Oyuntur*, No. 20-cr-68, 2022 WL 1500888, at *3 (D.N.J. May 11, 2022).

In terms of what evidence is implicated by *Brady*, the Third Circuit has explained that *Brady* "applies with equal force to the prosecutor's failure to disclose evidence which could have been used for impeachment purposes." *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) (internal citations omitted). This is because "[s]uch evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). However, under *Brady*, "[t]he government must disclose all favorable evidence[,]' even if the defendant could have obtained the evidence himself with reasonable diligence." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 292 (3d Cir. 2016) (en banc).

McNair alleges two separate *Brady* claims in this case: one based upon the alleged suppressed personnel files brought to light by the *Trentonian* articles and the

other based upon the alleged constructive knowledge of AUSA Michelle Gasparian of the facts underlying Article Three. Each argument is addressed below.

### i. *Suppressed personnel files*

McNair argues that the *Brady* standard is applicable because the facts described in the *Trentonian* articles should have been documented in the personnel files of Steimle and Astbury and those facts should have been disclosed to McNair. These personnel files, McNair argues, would have revealed a history of disciplinary infractions related to Steimle's and Astbury's conduct and revealed that Steimle and Astbury were involved in several lawsuits relevant to the present case. McNair argues that the facts as described in the articles should be set out in some official document about Stiemle and Astbury, and these documents should have been disclosed as part of discovery in this case. More specifically, McNair claims that it is not the articles themselves that constitute the *Brady* materials, but the material underlying these claims. The Government states that such information does not exist. (*See* ECF No. 118 at 8; Apr. 1, 2024 Transcript).

To the first prong of *Brady*—whether the Government has suppressed information—McNair has failed to show that any suppressed information exists. As previously stated, where a *Brady* claim is predicated on the argument that suppressed materials would have led to additional exculpatory materials, a "defendant must . . . produce some evidence to show that his investigation would have borne fruit."

*Maynard v. Gov't of Virgin Islands*, 392 F. App'x 105, 116 (3d Cir. 2010) (citing *United States v. Agurs*, 427 U.S. 97, 1109–10 (1976)); *see also United States v. Oyuntur*, No. 20-cr-68, 2022 WL 1500888, at *3 (D.N.J. May 11, 2022).  Here, McNair has produced no such evidence.  He points to Article One that was published several weeks prior to the trial that concerned excessive force allegations arising from a 2017 traffic stop involving Steimle; but the article has not been shown to be admissible at trial, and it lacks any details on the circumstances surrounding the incident.  The other *Trentonian* articles, one from 2019  and two from 2020, are similarly based on hearsay and have not been shown to be admissible at trial. Further, the Government has certified that there is no document in the file corroborating the allegations underlying the incidents.

McNair refers the Court to Article Three, and he wishes the Court to infer that—because Christie's gun possession charges were dismissed in May 2019, several months before trial—an internal investigation or report about the improprieties surrounding Steimle's and Astbury's alleged conduct should have been in the Government's possession or constructive possession at the time of trial. Where the Government certifies that it complied with its discovery obligations, (*See* ECF No. 118 at 8; Apr. 1 Tr.), the Court has little reason to undercut the Government's certification that it complied with these obligations and supplied the information to McNair's counsel.

As a side note, the Court hesitates to view the *Trentonian* articles as a basis for a *Brady* claim for a practical reason: there is a quantity of unverified information available online—truthful and otherwise. It is easy to find an article speaking one way or another about any public figure or any issue. Thus, the *Trentonian* articles standing alone are insufficient to support a *Brady* violation in this instance.

Accordingly, this *Brady* claim fails.

### ii. Constructive Knowledge of AUSA Gasparian

McNair also argues that AUSA Gasparian had constructive knowledge of the incidents underlying Article Three and that she had an obligation to disclose this knowledge. This argument is unavailing. As a preliminary matter, the Court notes that, during telephonic oral argument on April 1st, 2024, the Government denied that AUSA Gasparian had actual knowledge of the incidents underlying the *Christie* complaint at the time of the trial.

Defense Counsel argues that three principal cases show that—even if AUSA Gasparian herself did not have actual knowledge of the hearsay facts described in the *Trentonian* articles—knowledge should be imputed to her under the "one government" principle under *Brady*. (*See* ECF No. 116 at 9 (citing *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978); *Santobello v. New York*, 404 U.S. 257 (1971); and *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019)). Overall, the Court finds these cases unhelpful in evaluating Defendant's proposition for two main

14

reasons. First, two of these cases are only of persuasive value as they are out-of-Circuit decisions. Second, all three of these cases mainly deal with instances where there were direct discussions between prosecution witnesses and prosecutors in which promises were made and that information was withheld—intentionally or not—from the defense. No one has alleged that such a situation occurred here.

What is more, the Third Circuit has directly addressed the question of *Brady* obligations and the question of the government's constructive knowledge. In *United States v. Perdomo*, the Third Circuit initially imposed a "due diligence" limitation on *Brady*. 929 F.2d 967, 970 (3d Cir. 1991). Thus, constructive possession could be imposed on the Government so long as a defendant could not have acquired such information through his or her own due diligence. This requirement was later abrogated by the Third Circuit in *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 292 (3d Cir. 2016). Thus, since about 2016, it is the law of our Circuit that under *Brady*, the government "must disclose all favorable evidence. Only when the government is aware that the defense counsel already has the material in its possession should it be held to not have suppressed' it in not turning it over to the defense." *Dennis*, 834 F.3d at 292; *see also United States v. Bergrin*, No. 20-cr-2828, 2022 WL 1024624, at *9 (3d Cir. Apr. 6, 2022) (noting that *Dennis* held "that a defendant's exercise of due diligence is not a consideration when deciding whether the government has complied with its *Brady* obligations.").

15

With respect to the *Brady* claims in this case, the Court finds *dicta* in the Third Circuit's recent decision in a habeas petition—*Bracey*—to be instructive. The Third Circuit explained:

> Once *Brady* is understood to impose an affirmative disclosure obligation on the government, one in which criminal defendants are entitled to place their faith, a defendant's lack of independent investigation does not equate to a lack of due diligence, at least not without facts giving him a reasonable basis to suspect a *Brady* violation. To the contrary, in the typical case it is "unreasonable to expect the [petitioner]" to harbor suspicions that the government is defying its obligations . . . because such an expectation would be "fundamentally at odds with *Brady* itself[]" . . . .

*Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 293 (3d Cir. 2021). Thus, while McNair and his counsel had no obligation to demonstrate "due diligence" with respect to their *Brady* claim, this does not salvage McNair's *Brady* claim relating to AUSA Gasparian since the Court has no reasonable basis to believe a *Brady* violation took place. There is no evidence that AUSA Gasparian had constructive knowledge of the incidents in question. This is because, first, AUSA Gasparian had terminated her employment with the Mercer County Prosecutor's Office long before the civil complaint was filed and long before the alleged improprieties with Steimle and Astbury would have even come to light. In light of this factual timeline,[8] AUSA Gasparian did not have constructive knowledge of these incidents.

---

[8] *See* discussion at *supra* 8–9.

McNair tries to salvage this *Brady* argument by analogizing the present case to *United States v. Bravo*. 808 F. Supp. 311 (S.D.N.Y. 1992). This argument is unavailing since the facts in *Bravo* are distinct from the current case. Specifically, the *Bravo* court determined that there was evidence that came to light from articles published after the conclusion of a retrial that showed exculpatory evidence had not been provided to the defendant—specifically, that members of the Southern District of New York's U.S. Attorney's Office had knowledge of the agents' "propensity towards perjury . . . no later than . . . a full year before Bravo's retrial." *Bravo*, 808 F. Supp. at 317, 322. Further, it was undisputed that "the investigation into the activities of the [agents was] ongoing and ha[d] uncovered allegations of impropriety in other cases that might provide potential impeaching material of a [key witness]." *Id.* at 320. The *Bravo* court was presented with information showing that prosecutors had actual knowledge of ongoing investigations within their own office and allegations of impropriety directly relating to the testimony of the witness. That factual situation—one where prosecutors in the same office had actual or constructive knowledge of serious allegations and investigations surrounding agent improprieties—has not been presented here. Thus, *Bravo* is inapplicable.

McNair's claim for relief under *Brady* for AUSA Gasparian's alleged constructive knowledge also fails.

**b. <u>Rule 33: Newly Discovered Evidence</u>**

Under Federal Rule Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires . . . ." Fed.R.Crim.P. 33. If such a motion is made based upon the discovery of new evidence, a trial court may order a new trial if the following requirements have been met:

> (a) the evidence must be[,] in fact, newly discovered, i.e., discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) evidence relied on[ ] must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal."

*United States v. Jasin*, 280 F.3d 355, 361 (3d Cir. 2002) (alterations in original) (quoting *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976)); *see also United States v. Chu*, No. 23-1375, 2024 WL 1171077, at *4 n.9 (3d Cir. Mar. 19, 2024). Importantly, "if just one of the requirements is not satisfied, a defendant's Rule 33 motion must fail." *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008) (citing *Jasin*, 280 F.3d at 365). Motions for a new trial should be "'granted sparingly and only in exceptional cases.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008). For the reasons below, the information presented to the Court does not satisfy the Rule 33 *Iannelli* test.

McNair fails the first prong of the *Iannelli* test because the first prong requires "evidence" to be "newly discovered[;]" the articles from the *Trentonian*

cannot be equated to "evidence." It is difficult to determine a new trial is required when the substance of the four *Trentonian* articles is not reliable as it is hearsay. *See United States v. Bergrin*, No. 09-cr-369, 2020 WL 5015532, at *10 (D.N.J. Aug. 25, 2020), *aff'd*, No. 20-cr-2828, 2022 WL 1024624 (3d Cir. Apr. 6, 2022); *United States v. Lipari, No.* 92-cr-164, 1995 WL 84221, at *7 (D.N.J. Feb. 24, 1995), *aff'd*, 70 F.3d 1258 (3d Cir. 1995).

Even assuming *arguendo* that the first prong of *Iannelli* were satisfied, the second prong of *Iannelli* is not. The second prong requires the Court to determine that the movant diligently pursued the new evidence. Here, McNair has not been diligent because the "evidence" he has presented has not been corroborated by any fact. "[T]he second prong of the *Iannelli* analysis requires a defendant to allege facts 'from which the court may infer diligence.'" *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008) (internal citations omitted). While the Court does not believe this burden to be particularly high, McNair has failed to plead any facts showing his diligence in attempting to demonstrate the reliability of this information or corroborating by affidavit or other verification of any alleged fact in the hearsay. McNair attempts to explain his diligence by asserting the following:

> McNair does not have access to that information nor would due diligence have located it. He does not have access to the police databases. He does not have access to police reports. He does not have access to internal affairs complaints and their dispositions. The government has access to all those items and more. The government was on notice of these incidents . . . . McNair's only avenue for

information would be the newspaper.

(ECF No. 116 at 13).   While it may be true that McNair or his lawyer do not have access to police databases, this does not explain why McNair or his counsel did not check with the individuals or lawyers subject to the *Trentonian* articles or did not comb through the civil dockets in an attempt to corroborate the facts of the underlying cases.   Instead, McNair has merely attached the dockets to his motion to show the Court that lawsuits occurred or are ongoing.   This is insufficient to demonstrate diligence under *Iannelli's* second prong.

And again, even assuming *arguendo* that both prongs one and two of the *Iannelli* test had been satisfied, McNair fails to meet the remaining prongs of the Rule 33 *Iannelli* test.   The third prong—that the evidence must not be merely cumulative or impeaching—is in dispute by the parties.   This prong cannot be evaluated by the Court until McNair points to an admissible fact set forth in the *Trentonian* articles and demonstrates that that admissible fact meets the requirements for a new trial enumerated under *Iannelli*.

The question of whether the information is material is the next question in the *Iannelli* inquiry.   The Court notes that Article Three surrounds allegations that Trenton cops—including Stiemle and Astbury—planted a gun on Christie, and Christie later had charges against him dismissed.   More specifically, the allegations in the article involve Christie's civil lawsuit which claims Steimle and Astbury

allegedly manipulated gun evidence, resulting in a civil lawsuit. The article also mentions a separate incident in 2016 regarding a gun discovery where Astbury allegedly lied about discovering that gun in a sworn affidavit. It is notable that nowhere in the article is it stated that the 2019 charges against Christie were dismissed *because* of the civil complaint or the events underlying the civil complaint. To the Court, Article Three states that Christie believed that the investigation surrounding August 2018 arrest was a shoddy one and consequently filed a lawsuit. The article states the following: "[Christie's] lawsuit—without mentioning Christie's evidence that suggests the gun may have been planted—accused officers of willfully ignoring evidence that he ever possessed the weapon when officers rolled up on him in a parked vehicle."

Despite some facial factual similarities to the present case, McNair has not shown that this article is material. The Court finds the *Bergrin* case instructive on this point. *See United States v. Bergrin*, No. 09-cr-369, 2020 WL 5015532, at *10 (D.N.J. Aug. 25, 2020), *aff'd,* No. 20-cr-2828, 2022 WL 1024624 (3d Cir. Apr. 6, 2022). In *Bergrin*, the court evaluated a Rule 33 argument surrounding an exculpatory affidavit produced by an individual claiming that a government witness and cooperator had lied about the defendant's involvement in the underlying offenses. When discussing this affidavit's materiality, the *Bergrin* court explained that while "certainly material on its face, [the affidavit] is exculpatory only if one

credits the hearsay statements that support it.   Defendant, however, has failed to offer any arguments to show it would be admissible at trial." *Id.* at *10.  Here, McNair presents the Court with evidence much weaker than an affidavit—he presents articles detailing hearsay allegations against Trenton police officers that McNair argues demonstrates that the personnel files of two of these police officers contain exculpatory or impeachment information that was kept from him during his case.  The Court is unconvinced.  Even looking at the substance of the article that seems most pertinent to this motion—Article Three—it does not purport that the gun was actually planted nor does it say that evidence existed of the gun being planted; the article merely states that that accusations had been levelled in a civil lawsuit.  For these reasons, the Court believes that McNair has not satisfied his burden under this prong of the Rule 33 analysis.

Finally, not only has McNair failed to show that the other purported instances of misconduct that he would find in the personnel files would be admissible at trial, but he has not shown that such questioning would probably produce an acquittal at a new trial as required by the fifth prong of the *Iannelli* test.  This evaluation comes down to a judgment call that the jury *might* make based upon another lawsuit.  Not even addressing the fact that these articles' admissibility has not been shown, the facts and allegations in these articles go more specifically to Astbury—an individual who did not testify in this trial and thus was not the crux of the jury's decision in this

case. The Court does not agree with McNair that this information is material and would have thrown doubt onto the outcome of trial and would have likely produced an acquittal.

For these reasons, McNair's Motion for a New Trial is denied without prejudice in order that McNair and his counsel may further investigate and present relevant non-hearsay facts underlying their motion.

## ORDER

**IT IS** on this **14th** day of **May, 2024**;

**ORDERED** that McNair's Motion for a New Trial (ECF Nos. 97, 98) is **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that McNair's Motion to Appoint Counsel is **DENIED as MOOT** (ECF No. 101).

PETER G. SHERIDAN, U.S.D.J.

23